Sure. Good afternoon. My name is Steve Acquisto on behalf of the parole board. As a point of clarification, the procedure that you set out, does that allow for more than the 10 minutes or is that all in the That's all all in the 10 minutes per side. All right. In Mr. Coleman's petition, he challenged a 1995 parole decision denying him parole. Specifically, he alleged that Governor Pete Wilson had a no parole policy for murderers, which he pressured the parole board to follow, resulting in the parole board being biased. Now, in deciding this claim, the district court went well beyond the limited scope of the petition and found that Governor Wilson, as well as Governor Davis, had no parole policies, which they pressured the board to follow, thereby Mr. Acquisto, Mr. Acquisto, this is Judge Callahan. Since we don't have a lot of time, I sort of want to jump to the point. You're taking the position that this case is not moot. Is that correct? That's correct. And but what is the exact relief that the state is seeking here? I think you've just talked about that you feel that Judge Carlton went beyond the bounds of what he needed to do. Now, that was in a non-published decision, correct? That's correct. That's correct. So what, you know, what are you seeking exactly? What the board is seeking is a reversal of the order which finds that all parole hearings under the Davis and Wilson administrations were unconstitutionally biased. Well, but as far as this case is concerned, what relief would that give you? Well, the relief and the effect that that gives, first of all, is Mr. Coleman is seeking immediate release. That's what his appeal concerns. And that's predicated on Judge Carlton's finding in the order. So if that was found to be if this was found to be moot and if he was denied relief on his if he lost on his subsequent appeal, how are you prejudiced by that? Well, this this finding, as I said, affects all parole hearings conducted for murderers from 1991 through 2003. The tenures of those are just effective. And this is just this is just your belly. Are you suggesting that this, as you indicated, unpublished order would be somehow collateral estoppel offensively against the government? That's that's right, Your Honor. And in the Eastern District specifically, the local rules allow for the citation to unpublished opinions. But it's not precedent. I'm sorry. Go ahead. In the Eastern District, I believe that it could have be viewed as having collateral estoppel effect for any other parole or inmate who had a parole hearing during that time frame. You know, at least in our circuit, at least with respect to some states, we have circuit law that collateral estoppel doesn't apply to the government for a number of reasons. Now, are you are you conceding on behalf of the State that collateral estoppel would apply to the State of California? I'm not conceding that it does apply. I can't. You're just worried about it. That's right. And and I think another consideration is this ruling is that two governors had unconstitutional policies. It's an important decision. Excuse me. Can I can I ask a question? I'm sorry. Excuse me for interrupting. But one thing that bothers me considerably, given the horrible effects you envision this opinion is having, why was it that none of the evidence that was put before the lower courts was ever challenged? Why was it there was no objection, as I understand it, which is a predicate to preserving the issue on appeal? Why was that not done? Well, why was that evidence allowed to go in unchallenged? Because the evidence essentially collapses on its own weight. The evidence was speculative. The evidence does not. But there was no objection. There was no objection on that basis, was there? Well, there was there were arguments about whether discovery should be allowed and what should be allowed. There was no nobody objected. There was no ruling that we can look at to say that the court should not. We may conclude that it might have been hearsay. It might have been speculative. But the objection was never made. I believe that regardless of whether an objection was made, it was error, clear error for the district court to rely on evidence that does not substantiate the finding that it says it substantiates. Based directly on. Let me ask you this. What would what evidence would Mr. Coleman have to produce in order to, in your mind, support that either Governor Wilson or Governor Davis had a no parole policy for murders? Well, the governing the governing legal standard for bias claims provides that an administrative adjudicator is presumed to act with honesty and integrity and that the petitioner bears the burden of presenting evidence, which is which establishes either an actual bias on behalf of the board in this case or an appearance of bias which stems from a pecuniary or personal interest. They would have had to present evidence. Pecuniary or personal interest largely goes to the appearance of bias. I mean, here we have direct evidence. Excuse me. Here we have direct evidence that at least one member of the board, Commissioner Gillis, was being influenced at least by what he perceived to be a governmental policy. There is testimony that he specifically didn't know the law, that he was going to essentially follow that policy, whether it existed or not. And that all went unchallenged. And isn't that sufficient for the district court to have made its finding? Also. Can you say that's clear error? Also before the district court, one of the primary pieces of evidence the district court relied on was the declaration of Albert Lette. He was a commissioner who left the board in 1992, was not even on the board during the relevant time frame, 1995, and what he said about Commissioner Gillis was that commissioners like himself, referring to Lette, and Gillis, who had law enforcement backgrounds, were no more likely to hold unfair parole hearings. So to the extent there might have been other evidence about Gillis. I understand. All you're saying is maybe there was conflicting evidence, but that doesn't mean the finding was clearly erroneous. There's evidence to support the finding, isn't there? Where there's conflicting evidence, the court is obligated to have an evidentiary hearing. However. But here it sounds like you're saying they shouldn't have believed this evidence. It didn't sound like you're saying that there's conflicting evidence. It sounds like you're saying, well, because he wasn't on the board, even though he makes remarks that Gillis supposedly stated, you're saying it shouldn't have been believed and it shouldn't have been accepted. But I keep coming back to the district court, that's all it had before it, so was it clear error for the district court? Did the district court have a duty to ask for more evidence? The district court erred in making any finding regarding the 95 hearing because none of the evidence specifically addressed the 95 hearing. None of the evidence even mentioned Shoffel and Bancourt, the two other commissioners at that hearing who comprised a majority. And other evidence indicated that commissioners such as Gillis and specifically Gillis were not biased and were no more likely to hold unfair parole hearings. Let's take the hearing you're having now. If one of us were biased, if one of us were following the dictates of, let's say, a president who said in these kind of cases, don't rule for the board or for one side or the other, would you say the fact that there were two others who were not so influenced removes the taint? You wouldn't be happy with that, would you? Well, the evidence, though, Your Honor, is even with regard to Gillis, it would be error to conclude that he was biased because Mr. Letty gave affirmative testimony that he wasn't. So making a finding of bias where he specifically said he wasn't biased was clear error. And the other thing ---- You only have about a minute left, and you ought to say it for rebuttal, but answer one question for me. Did you move to stay the district court's order while you were on appeal? No. Oh. Now, why didn't you? That would have kept it from becoming a move, wouldn't it, if you had gotten to stay? No. No, Your Honor. Why? Under ---- You can say, you know, we'd like to stay the district court's habeas corpus order pending appeal. Under the United States Supreme Court decision of Maness v. Myers, it lays out the proper procedure, which is to comply with an order, then appeal. You never heard of asking for a stay? It's done by your office all the time. That's true. But that should not affect whether this appeal becomes moot, because the Maness decision specifically authorizes the procedure that the Board followed. All right. Your time is just about gone, but, you know, we'll give you, like, a minute and a half or two minutes for rebuttal. All right?  All right. May it please the Court, Anne McClintock on behalf of the Petitioner who remains in custody. I think it's clear from your questions that all members of the panel clearly understand the clear error standard that applies to the question about the evidence of the factual findings by the district court. And I'm just going to go ahead and ---- Let me ask you this, then. Before you say I totally understand, let me ask you this. Why doesn't the evidence just support that not very many people got paroled? Because there is evidence in the record that some people got paroled. So why wasn't the policy don't parole a lot of people, but why ---- but we're saying that the evidence supports a no parole policy. Some people got paroled. How do I reconcile that? Well, you have to keep in mind your standard review. So the standard review is not that you would have come to a different conclusion based on the evidence presented to you if you were a district court judge, if you were Judge Chiavelli acting as his traditional job. But whether you have a firm and definite conviction that the district court's finding about the facts here was wrong. And if you take a look at ---- But we know that people did get paroled. We know that ---- And how do we know ---- I guess what I'm saying is that I could say, okay, people got paroled because there were commissioners that didn't follow the no parole policy. That would be the argument I guess I would make if I was in your position. But it still existed. But how do we know that from Governor Davis and Governor Wilson that that was their policy as opposed to what people thought they were doing? Well, on one level, it doesn't matter whether it really was their policy. If it had the effect, if the belief had the effect on the person or the group of people in their training and how they implemented the regulations and the statutory rules about assessing parole. In reality, we know from the evidence both from what Albert Letty said about contact he had from the YACA Commissioner Joe Sandoval under the Wilson administration. And Mr. Equesta is incorrect in saying that Letty had nothing to do with the relevant time frame. He was, just like Commissioner Tom was in his deposition, someone who had been on the board under Duke Mason and transitioned into the early part of the Wilson administration. So their description in their depositions detailed how both the picking of commissioners changed, how the decisional review changed, and all these pieces fit into a puzzle that demonstrated, and I think it certainly is not clear error, that there was a no parole policy. The fact that six people out of 2,500 might have gotten through the system doesn't show that there is not a no parole policy. It just shows, as you mentioned, that it's not always applied in every case. With every rule, there are going to be some exceptions. Even under Gray-Davis, there were some people who got out whether it was just because of battered women syndrome or something else. So ---- Well, let me ask you, if I can, and I think I understand where you're going on, and I hope Judge Callahan's question has been asked, but I do want to come back to the question that Judge Callahan had earlier and see your response. If it were concluded that the board's appeal were moot, what is your impression about what use can be made of the opinion below? I think it depends on the ---- If the appeal is moot, go ahead. Well, mootness really brings up our appeal. I mean, I don't think you ---- the only way that you can decide it is moot is if you decide that the remedy, that the conditional writ had been complied with. So, but just ---- Well, let me ask that question directly. Hypothetically speaking, if we were to conclude that the board's appeal is moot, what does that do to your appeal? Well, the only way that the board's appeal is moot is if the conditional writ was complied with. So you have rejected ---- you necessarily have to reject our appeal. Well, okay. And your position is that it is moot, right? Well, I have a twofold position. I don't believe that the ---- But I thought I read in your brief. Well, in my response to their brief, I'm going to say that their brief is moot. The simple answer, if I can back up a half a second, is that the only way you can address the substantive merits of the State's appeal is to have them concede or you conclude that the remedial order in granting habeas relief was not complied with. I would concede that if you come to that conclusion, then you can address the substance of their appeal. Well, wait a minute. And that's your position, isn't it? Yes. That the remedial order was not complied with. Right. But the difference is, is that the State's trying to have both its cake and eat it at the same time. They're trying to say that we don't even ---- that they can address, that they don't have to risk having to require Mr. Coleman to be released from prison, enforcing the writ that was not complied with, and still get to overturn the underlying judgment that they didn't seek a State for that they went ahead and complied with. So I think as a logical matter, you have to address whether the remedy, the conditional writ, was complied with. If you conclude that it was not complied with, then you can address the substantive appeal that they've raised is, is there sufficient evidence. And I think given the clear error standard, you know, the earthy description of the five-day-old unrefrigerated fish, that there is ample evidence. Just Pete Wilson's statements to the press, just Judge Albert Letty's declaration from ---- any one of those simple pieces of evidence is sufficient evidence under that extremely deferential standard of review. Let me ask you then, let me just go to the direct question. Why was the remedial order of Judge Carlton not complied with? You had a hearing, right? We did. And well, let's back up one step. Whose burden is it to show what? I think with the remedial order that it would be my initial burden to show some prima facie evidence to show that it hasn't complied with, and I think we met that burden. Since it kind of goes back to an ---- akin to what the State is arguing about presumptions of regularity in proceedings, we have a judgment. At the time of the remedial hearing of July of 2005, there is a presumptively correct judgment that the board of prison terms for essentially a decade or almost a decade has been conducting, implementing a no-parole policy. So once I present the district court with the evidence of what took place, the transcript of a hearing and what information we found out about from the attorney general's office about the two commissioners or the deputy commissioner and the commissioner who conducted that hearing, and whatever information we have about the ongoing governor review and the process and the training of the commissioners. But all of that evidence doesn't make a prima facie showing of some kind of bias, does it? I think, coupled with the presumptive correctness of the district court's judgment that there is a preexisting bias, it does. Well, wait a minute. No, no. I thought the judgment was that there was a preexisting bias during the Davis administration and arguably maybe during the Wilson administration. Well, the other way around. It's the Wilson administration. Okay. Either way. Right. But either way, I mean, there's no ruling by the district court that they carried over to the Schwarzenegger administration. Right. And as far as that that is a factual. So what do you mean by presumptive bias? Well, what we have, and this is where I think the clear error applies to Judge Carlton's ruling on the remedial motion, is that we've got the evidence before the Court, and if you review the depositions and explanations of how board members and deputy commissioners are trained, is that we don't have a here's the rule, it's very on-the-job training, it's shadowing people around in order to understand what your job is and how you do it. And so we've got, in the guise of Deputy Commissioner Elizabeth Richardson, who is, to me, is the source of the clear error, we've got a woman who the Attorney General has informed us, and we told district court, that she comes on during the Wilson, the end of the Wilson administration, I believe. I know that dates are escaping me at the moment. But on the Wilson administration, starts doing hearings either the last part of the for lifers throughout the Gray-Davis administration. Throughout that entire time, we have a judgment from district court, factual findings that are not clearly erroneous, that there is implementing ongoing no-parole policy during that period. So the presumption is that her role in Mr. Coleman's hearing is going to be a product of that same no-parole policy. Unless the board is why? Pardon? Counsel, in the situation that we have in the 1995 hearing, we have a finding that there was some policy. But also, and to me equally important, we have evidence that went unrebutted that a member of the very board that reviewed your client's parole hearing had been influenced by that policy. In my view, both of those prongs are critical. Now, what do we have with respect to Governor Schwarzenegger that shows either, A, that the policy absolutely was continued, and or that anybody involved in that 2005 hearing had been influenced by any such policy? Specific evidence. Well, the specific evidence we have is just what detailed about Ms. Richardson's history with the board, plus her statement at that remedial, supposedly remedial hearing where she said, I don't understand why the board did not respond to these findings and recommendations. So the implication of that to me is clearly that there's been no remedial training, there's been no response by the board to this finding. So she's still continuing to operate as she had before. And I know that my time is up. Your time is up. But if you think you need it, we'll give you a minute for rebuttal. All right? On your cross-appeal. Thank you. I haven't addressed the finding with regard to Governor Davis. It was error for the district court to make any finding regarding Governor Davis because no claim was presented in the petition, and the petition defines the claims that are properly presented in a habeas corpus action. Further, no such claim was exhausted. So that was clear. That was an error. Second, the Court did not focus on the governing legal standard. And there was plenty of evidence before the Court that indicated that many hearings during the Wilson administration were unbiased. And I think the board is entitled to a finding based on the governing legal standard and based on a proper application of the evidence, even if it's conflicting to that standard. Finally, if or not finally, excuse me. If the board's appeal is moot, and I don't believe it is under the Maness case, then Coleman's appeal is also moot. It is not fair for Coleman to be able to allege the board did not comply with an order and then tie the board's hands at the ability to challenge that order. And finally we're going to respond to anything that was said. Do you want to respond to anything that was said about the 2005 hearing? Well, yes. And that's the last thing I'd like to address. It's clear from Coleman's moving papers in his motion for immediate release that he had no evidence to support his allegation of bias at that hearing. He says throughout his motion that it's based on information. By the way, by the way, let me ask you this. This seems to be Ms. McClintock's argument that because of the findings Judge Carlton made and because of the remedial order, there's almost like a presumption, you know, that this biased state continued on into the new hearing. And once you make some kind of very minimal showing, then it's up to you to show that it wasn't biased. There's no law to support that. On the new hearing. There's no law to support that. As the district court correctly found in this respect, it was a different administration. The finding of bias was that the Wilson administration and the Davis administration pressured the board to be biased, not that the board was biased on its own. And once those administrations are no longer in existence, there's no evidence and there was no finding to conclude that the Schwarzenegger administration was biased. The issue was, did the district court, based on the evidence before it with regard to Coleman's motion, make the correct ruling? Coleman controlled the timing of his motion, and he admittedly presented no evidence to support it. On that basis, the district court did not err in denying a motion that was unsupported by any evidence. Now, Coleman may argue, well, the district court did not or, excuse me, the board did not allow us, we asked informally for information. The board did not provide that. Well, there's formal discovery procedures, and this is formal litigation. They controlled the timing of their motion. If they believed that they needed evidence to support that, they should have requested discovery through the district court, but they should not get two bites at the apple. All right. You're way over your time, right? Can I ask one quick thing, counsel? Are you a new father? Yes, I am. Congratulations. He's doing great, and thank you very much for continuing the hearing to this date. Congratulations. Thank you. I can't resist it. He didn't bring pictures, so. He'll learn. He'll learn, guys. We didn't admit to anything about not presenting evidence. We presented the evidence that was available regarding the 2005 remedial hearing. The analogy that I'd like you to consider, and I think this fits, although there are differences about it. If you've got an administration that is biased, and the image from history and from my life experience that immediately came to mind when I was thinking about this the other day is George Wallace standing in the University of Alabama Schoolhouse Gate saying, you know, trying to enforce his inaugural address about segregation now, segregation tomorrow, segregation forever. Once he leaves office, if through those policies about segregation, he implements a regime and trains people in order to violate students' rights on admissions, and then he leaves office, those informal policies, those formal policies, that mindset still exists. Unless the people who are making the line decisions are retrained or formal steps are taken, you cannot assume just because of administration changes that that mindset ceases to exist. Counsel, you know, it seems to me that the evidence regarding the specific bias at the 1995 hearing is not the strongest evidence we've ever seen. As pointed out, it went unrebutted and unchallenged. But what, if any, and I keep asking this question, but I don't think I saw anything in the record. Other than your position that a policy was implemented during those two administrations and that somehow we have to presume it carries on, was there any specific evidence that either of the two commissioners at the 2005 hearing was in any way biased against your client or against granting parole? Well, I would like to answer that first by pointing out that the challenge on the systemic bias was not to just the 2005 or the 1995 hearing. His claim was that this is a systemic ongoing thing. So to focus the prejudice to statements or admissions from specific commissioners is not what his claim was about. It's not what the judgment found. So I think the analogy to the racial context has some force to it. The only other evidence that we have about the specific commissioners at the 2005 hearing is just the racial context.  I mean, you're saying that this is not true. And you take Judge Carlton's order, so, you know, you have to hold a hearing within X number of days. What is the State supposed to do? I mean, sort of cross-examine its own commissioners before it starts a hearing now, you know, now you swore you're going to be, you know, unbiased in this hearing and you're going to forget everything you heard about what the board did in the past, so forth? What they have to do is remedial training, a focusing. And it's the same problem you see repeatedly in the — And you said that nothing, that the board took no response to the FNRs issued in December of 2004. No, and I'm talking about in the Schwarzenegger administration. I am talking about that as well. At the July 2005 hearing, Deputy Commissioner Richardson made the comment in her closing remarks about unsuitability where she just volunteered that what I don't understand is why the board did not respond to the December 2004 findings and recommendations. If she — what that is, is evidence that no one has come to her and said, look, this is the proper way, here are the regs, what you have to look at is a linkage between X, Y, and Z factors and the person's current dangerousness, and you have to put aside the presumption — there's not a presumption of X, Y, and Z. There has to be remedial training. Her statement shows that there was nothing. There was no response. And if there are no other questions. Your time is well over also. All right. Thank you very much. Okay. Well, thank both counsel. Thank you. Thank you. Enlightening argument. And the panel will be in recess. All right.
judges: Tashima, Callahan, Schiavelli